IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **VANCE S. JOHNSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 11-924-GPM-CJP |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

### REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge G. Patrick Murphy pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Vance S. Johnson seeks judicial review of the final agency decision denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to **42 U.S.C. § 423**.[1]

### Procedural History

Mr. Johnson applied for benefits in February, 2008, alleging disability beginning on March 17, 2002. (Tr. 191, 194). The application was denied initially and on reconsideration. After a hearing, Administrative Law Judge (ALJ) Joseph L. Heimann denied the application on April 29, 2010. (Tr. 67-77). Plaintiff's request for review was denied by the Appeals Council,

---

[1]The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

and the April 29, 2010, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

(1) The ALJ improperly rejected his treating psychiatrist's opinion that drug and alcohol use was not material to his disability.

(2) The ALJ erred in his determination of plaintiff's credibility

## Applicable Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** However, limitations arising from alcoholism or drug use are excluded from consideration of whether a claimant is disabled. **42 U.S.C. §423(d)(2)(C); 20 C.F.R. §404.1535.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

**Weatherbee v. Astrue, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See, Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992); Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).** If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant has a severe impairment but does not meet or equal a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984).** The Commissioner bears the burden of showing that there are a significant number of jobs in the economy that claimant is capable of performing. **See, Bowen v. Yuckert, 482 U.S. 137, 146, 107**

S. Ct. 2287, 2294 (1987); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

It is important to keep in mind the proper standard of review for this Court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).**  Thus, the question for the Court is not whether Mr. Johnson was, in fact, disabled during the relevant time period, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made. **See, *Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**

This Court uses the Supreme Court's definition of "substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**  In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Heimann followed the five-step analytical framework described above.  He concluded that plaintiff worked since the alleged onset date, but the work did not rise to the level of substantial gainful activity.  He determined that plaintiff had impairments of depression, bipolar disorder, polysubstance dependence, osteoarthritis in the left shoulder and right hand, and

degenerative disc disease in the lumbar spine.  He found that, absent substance abuse, Mr. Johnson's impairments did not meet or equal a listed impairment, which plaintiff does not dispute.

The ALJ concluded that, absent substance abuse, plaintiff had the residual functional capacity (RFC) to perform a limited range of work at the light exertional level.  Relying on the testimony of a vocational expert, the ALJ concluded that Mr. Johnson was able to perform jobs such as office cleaner, small parts assembler and car wash attendant, which exist in significant numbers in the regional economy.

### The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation.  The following is a summary of some of the pertinent portions of the written record, focused on the issues raised by plaintiff.

**1.     Agency Forms**

Mr. Johnson was born in 1955, and was 46 years old when he allegedly became disabled in 2002.  (Tr. 297).  He had previously applied for social security benefits.  (Tr. 298).  He completed the 12th grade.  (Tr. 307).

Plaintiff stated that he stopped working at his job as a warehouseman on March 17, 2002, because he could not fill orders and could not remember where he put products.  (Tr. 302-303).

In a Work Activity Report, plaintiff said that he started working for Pyramid Health Care in May, 2008.  He worked 11.5 hours a week as a cleaner and cook.  (Tr. 320).

**2.     Evidentiary Hearing - March 5, 2010**

Plaintiff was represented at the hearing by an attorney.  (Tr. 7).

He was living with his sister at the time of the hearing. (Tr. 15-16). He was 5'8" tall and weighed about 230 pounds. (Tr. 19). He graduated from high school and had a few hours of college credit. (Tr. 12-13). Mr. Johnson was in the Army from 1974 through 1980. (Tr. 13).

Mr. Johnson testified that he lost his job in March, 2002. (Tr. 14). He was homeless and was in and out of the VA Hospital. He applied for benefits earlier, but did not appeal from the denial. (Tr. 14). He later testified that he was fired from his job. He was sent to take a drug test, and he left the building. (Tr. 23). He has had alcohol problems and has used cocaine. He last used alcohol or illegal drugs in February, 2008. (Tr. 23-24).

He worked part-time for Pyramid Health Services from May, 2008, to April, 2009. He was helping elderly people with errands and cleaning their houses. He was fired. Someone said he took a whole bottle of medicine from her, but he denied it. (Tr. 25-26). He was collecting unemployment at the time of the hearing. (Tr. 26).

Mr. Johnson testified that he was unable to stand for very long due to back pain. Sitting for more than 30 minutes caused him "vertical strains" in his right leg. (Tr. 17). He felt that his mental health was a bigger problem than his physical Health. He testified that he was suicidal and had mood swings. (Tr. 29). He had difficulty interacting with people because of anxiety and a "hot temper." (Tr. 30-31).

He had no side effects from his medications. (Tr. 32).

The ALJ noted that he made about $800 a month at Pyramid. Mr. Johnson said "Because I was told by a friend, if you make $940 a month, you couldn't get on disability." (Tr. 34).

A vocational expert also testified. The ALJ asked the VE to assume a person who was limited to work at the light exertional level, further limited to only occasional postural activities

(e.g., climbing, stooping, kneeling), and low stress work with only occasional decision making and only occasional interaction with the public.[2] The VE testified that this person could not do plaintiff's past relevant work, but could do the jobs of office cleaner, small parts assembler and car wash attendant, all of which exist in significant numbers in the regional economy. (Tr. 35-40).

**3.     Medical Records**

Plaintiff contends that his mental condition is disabling even absent drug and alcohol use. Therefore, the following review of the voluminous medical records focuses on that issue.

Mr. Johnson was diagnosed with depression in January, 2002, and was prescribed Paxil. (Tr. 375-376).

In April, 2003, Mr. Johnson was seen in the emergency room, complaining that he had been assaulted. He smelled of alcohol. He said that he was out of his medications as the police had "stolen" them when he was arrested two months earlier. (Tr. 411). He was described as "very loud, argumentative, threatening + use of foul language." (Tr. 413). A CT scan showed evidence of old facial fractures. (Tr. 419-420).

In May, 2003, Mr. Johnson was seen in the emergency room after having been assaulted during a drug deal. (Tr. 396). He tested positive for cocaine and alcohol. (Tr. 400). A laceration over his right eye was stitched. (Tr. 394).

Plaintiff was admitted to St. Elizabeth's Hospital on June 1, 2005, for depression with

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §404.1567(b).

homicidal and suicidal thoughts. He tested positive for marijuana, cocaine and alcohol. He was hospitalized for 5 days. He indicated that he was homeless and could not find a steady job. He complained that his varicose veins hurt. The discharge diagnosis was major depression, rule out bipolar disorder and posttraumatic stress syndrome, along with polysubstance dependance. (Tr. 431).

In March, 2006, plaintiff was again seen in the emergency room after having been in a fight. He had been drinking. A CT scan of the head showed an old nasal bone fracture. (Tr. 698-700).

The rest of plaintiff's medical treatment was done at the John Cochran Veterans Administration Medical Center in St. Louis, Missouri.

In May, 2005, x-rays showed mild degenerative changes in the left shoulder, and normal right shoulder. (Tr. 984). In October, 2005, Doppler studies were done due to varicose veins in plaintiff's legs. The studies showed no deep vein thrombosis. (Tr. 983).

Plaintiff was admitted to John Cochran through the emergency room on March 4, 2008, after taking an overdose of Gabapentin (Neurontin) and Citalopram (Celexa). (Tr. 1014).A psychiatry consult note indicates that, the day before, he had been upset when he was referred to physical therapy instead of getting a cortisone shot that he wanted. He indicated that he had wrecked his truck in February, 2008, when he was using cocaine, and was then not allowed to return to his sister's home, where he had been staying. (Tr. 1043). Dr. Antonina Gesmundo, a psychiatrist, discharged him on March 19, 2008. On that date, plaintiff had no complaints of physical pain or depression. He said he was feeling better. Dr. Gesmundo indicated that he had reached "the maximum hospital benefit." (Tr. 1142).

In May, 2008, a social worker at John Cochran took plaintiff off the "high risk list" after consulting with Dr. Gesmundo. She wrote, "While he did make a suicidal gesture, it became clear that his intent was not to hurt himself, but to get into the hospital." (Tr. 1751).

In June, 2008, he complained of increased pain in his shoulder and back due to increased exertion at his job and at home. He was working in maintenance and housekeeping. (Tr. 1749).

Plaintiff saw Dr. Gesmundo on June 16, 2008. He said that he had been sober for 3 to 4 months and the was "doing fine." He was living with a friend and had a part-time job with Pyramid Health Services. He was happy about his situation, but still had mood swings and needed his medication. His mood and affect were normal. He had no suicidal or homicidal thoughts. He was alert and oriented, with good concentration. His GAF was rated at 60. (Tr. 1747-1748).

In August, 2008, Mr. Johnson told an advanced practice nurse that he had not been able to lose weight "even with working hard." He said that he was trimming trees and doing maintenance work to support himself. (Tr. 1738).

On September 12, 2008, plaintiff told Dr. Gesmundo that his hours at work had been reduced and he was only working 11½ hours a week. He was barely making ends meet. He was still sober. He was more anxious than depressed. On examination, Dr. Gesmundo found that his mood/affect was normal. He had no delusions, hallucinations, suicidal or homicidal thoughts. He was alert and oriented, but said that he had trouble concentrating. His GAF was again 60. (Tr. 1889).

On September 17, 2008, Dr. Gesmundo filled out a form entitled Mental Health Source Document. Dr. Gesmundo stated that plaintiff had bipolar disorder-depression, personality

disorder, alcohol dependence in remission and cocaine dependence in remission. In answer to a question whether alcoholism or drug addiction were a contributing factor material to the determination of disability, Dr. Gesmundo answered "yes." In answer to the question whether, if drug or alcohol use were to stop, would plaintiff still be disabled, Dr. Gesmundo again answered "yes." (Tr. 1850-1851).

On March 2, 2009, plaintiff came to Dr. Gesmundo's clinic without an appointment. He said he had been suspended from his job caring for an elderly, disabled man because the man's wife falsely accused him of hitting her. He was stressed because he was not making any money and had bills to pay. He had been collecting metals to sell, but the price of metals had dropped. He was feeling down and worried, but was trying to keep busy doing things like gathering wood and trying to do outside work. He had no suicidal or homicidal ideas, no delusions or hallucinations, was alert and oriented with good concentration. His GAF was 60. (Tr. 1919-1920). On April 3, 2009, he was still depressed because he had no job and no income, and had pain in his shoulders, back and hands. However, he said he was doing better than he had been on the last visit. His GAF was rated at 55. (Tr. 1913-1914).

On May 12, 2009, Mr. Johnson requested that the VA primary care clinic give him a back brace to wear while lifting and working in yards. (Tr. 2027).

Mr. Johnson saw Dr. Gesmundo on May 14, 2009, as a walk-in. He told her that he had been cutting tree branches two days earlier and "thought somebody was around, but nobody was there." He thought this might be due to stress from recent thunderstorms. He was still sober. He said he was unemployed, living with a friend, and drawing unemployment benefits. He was looking for a housekeeping job. On exam, his mood and affect were normal. He was depressed

because his dog was sick and he could not take her to the vet.  He denied paranoia, but said he was seeing people who were not around.  He had no suicidal or homicidal thoughts.  He was alert and oriented, and his concentration was good.  His GAF was rated at 60.  (Tr. 2025-2026).

On May 18, 2009, plaintiff was seen in the Optometry Clinic for an eye exam.  He requested tinted glasses because he "works outside a lot."  (Tr. 2018-2019).

On June 26, 2009, Mr. Johnson told Dr. Gesmundo that he was not that depressed, but was anxious.  Stressors included his disability claim, "no regular job," and worrying about a sick friend.  He was living with a "lady friend, who needs help."  He had no suicidal or homicidal thoughts.  He was alert and oriented, and his concentration was good.  His GAF was rated at 60.  (Tr. 2009).

Mr. Johnson returned to Dr. Gesmundo on September 4, 2009.  He told her that he was "dong okay" and was not as depressed because he was on medication.  He was living with his sister in Waterloo, Illinois.  He told the staff that he did dishes, took out the trash and cleaned the floor at his sister's house.  On exam, his affect was blunted.  He denied delusions or hallucinations, but said he "had dreams."  had no suicidal or homicidal thoughts.  He was alert and oriented, and his concentration was good.  His GAF was rated at 55.  (Tr. 1986-1987).

On September 11, 2009, Mr. Johnson told an Advanced Practice Nurse that he was "physically very active working at this friends [sic] house."  (Tr. 1975).

The last visit with Dr. Gesmundo was on December 3, 2009.  Plaintiff reported that he was depressed because he was in pain and not able to do that much.  He was upset because the friend with whom he used to live had given away plaintiff's boat.  He was still living with his sister and said that he helped her clean the house and fold laundry.  He had remained sober.  His

affect was described as "sharp." He had no suicidal or homicidal thoughts. He was alert and oriented, and his concentration was good. His GAF was rated at 45. (Tr. 1967-1968).

## Analysis

Plaintiff first argues that the ALJ erred in his treatment of Dr. Gesmundo's opinion, set forth in her September 17, 2008, report. Plaintiff's argument rests on two propositions. First, he argues that Dr. Gesmundo's records reflect severe ongoing mental impairments even after he stopped using drugs and alcohol. Secondly, he agues that Dr. Gesmundo's opinion is entitled to "great weight" pursuant to 20 C.F.R. §404.1527(d).

The ALJ was not required to give any weight at all to Dr. Gesmundo's statement that plaintiff's condition is disabling even without drug or alcohol abuse. The opinion of a treating doctor is not entitled to controlling or special weight on the issue of whether a claimant is disabled because the issue of disability is an issue that is reserved to the Commissioner. See, 20 C.F.R. §404.1527(e). SSR 96-59 explains:

> However, treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

SSR 96-5p, at *2. See also, ***Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010)**.

Plaintiff is correct in his assertion that *medical* opinions must be weighed using the factors set forth in §404.1527(e). That requirement does not apply to Dr. Gesmundo's opinion that plaintiff's condition was disabling even absent drug and alcohol abuse because such an opinion is not a *medical* opinion. Medical opinions are defined as statements "that reflect

judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). By definition, opinions on issues that are reserved to the Commissioner are not medical opinions. §404.1527(e). That is not, however, the end of the analysis.

Dr. Gesmundo's report contained other opinions that do qualify as medical opinions. She assessed the severity of plaintiff's symptoms and set forth his diagnosis and prognosis. See, Tr. 1850-1851. Laying aside the statement as to disability, the ALJ was required to weigh the rest of Dr. Gesmundo's opinion applying the regulatory factors. An ALJ must give "good reasons" for discounting a treating doctor's medical opinion; if the opinion does not merit controlling weight, the ALJ must consider the "checklist of factors" set forth in §1527(d). **Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010)**, citing **Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010).**

The only reason that the ALJ gave for rejecting Dr. Gesmundo's opinion in its entirety was that Dr. Gesmundo assigned a GAF score of 60. The ALJ said that he took administrative notice of the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM-IV), which states that a GAF score of 51 to 60 denotes "(m)oderate symptoms OR moderate difficulty in social, occupational, or school functioning." See, Tr. 75. The ALJ completely overlooked the fact that Dr. Gesmundo rated Mr. Johnson's GAF at 40-60, with 60 being the highest GAF in the year to date. See, Tr. 1850.

Mental health clinicians commonly use a multi axial system to assess a patient's condition. "A multi axial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict

outcome." *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 28 (Text Revision, 4th ed. 2000)* ("DSM-IV"). The DSM-IV assessment has five axes, as follows:

| | |
|---|---|
| Axis I | Clinical Disorders |
| | Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders |
| | Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychosocial and Environmental Problems |
| Axis V | Global Assessment of Functioning. |

At Axis V, the clinician uses the GAF scale to report his or her "judgment of the individual's overall level of functioning." DSM-IV at 32. The GAF scale consists of ten ranges of ten points each, from 0 to 100. DSM-IV at 32-34. The clinician is rating symptom severity and functioning, and is to assign the rating that reflects the worse of the two. DSM-IV at 32-33.

According to the DSM-IV, a GAF score in the range of 41 to 50 reflects "**[s]erious symptoms** (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (*e.g.*, no friends, unable to keep a job)."

Because the GAF score measures both the severity of symptoms as well as the level of functioning, and it reflects the worse of the two, the Seventh Circuit has held that "the score does not reflect the clinician's opinion of functional capacity" and the ALJ is not required to determine disability "based entirely" on the GAF score. **Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010).** However, the Seventh Circuit has also held that, while the ALJ need not base his opinion "entirely on GAF scores," it is error for the ALJ to discuss only high scores and ignore evidence of low scores. **Walters v. Astrue, 2011 WL 5024149, *5 (7th Cir. 2011)**. Thus, it was

error for the ALJ to reject Dr. Gesmundo's report based solely on the high score of 60 while ignoring the low score of 40.

Further, the ALJ neglected to adequately discuss Dr. Gesmundo's records after September, 2008. The ALJ said only that plaintiff's testimony that he continues to be suicidal was not supported by the records, and that his GAF scores have been "near 60" since he stopped using drugs and alcohol. See, Tr. 74. This ignores the fact that, on the last visit with Dr. Gesmundo, plaintiff's GAF was 45. (Tr. 1968).

Plaintiff's second argument does not fare so well. He argues that the ALJ's credibility determination should be overturned because it was conclusory and not supported by the record.

Plaintiff correctly points out that ALJ Heimann used the boilerplate language that has been repeatedly criticized by the Seventh Circuit. See, **Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012), and cases cited therein.** However, it is not the use of the boilerplate language in and of itself which is objectionable; it is the use of the boilerplate language unaccompanied by findings which are supported by evidence in the record. **Shauger, ibid; Shideler v. Astrue, ___ F.3d ___, 2012 WL 2948539, *405 (7th Cir. 2012).**

Here, the ALJ gave valid reasons for finding that plaintiff was exaggerating the intensity, persistence and limiting effects of his symptoms. His remark about not being eligible to receive SSI if he earned more than $940.00 a month suggested that he limited his work so that he would be under that threshold. He had given conflicting statements about why his job had ended. Healthcare providers described him as manipulative and questioned his credibility. He worked at least part-time. When sentenced to 80 hours of community service on a disorderly conduct charge, he worked 5 to 7 hours a day so that he could get it over with. His physical complaints

were not supported by the findings of the doctor who performed a consultative examination. . . All of these are valid considerations. See, 20 C.F.R. §416.929(c)(3); SSR 96-7p. Further, he collected unemployment benefits while claiming to be disabled. The fact that a claimant has represented himself as able to work for purposes of receiving unemployment benefits is relevant to his credibility. **Knox v. Astrue, 327 Fed. Appx. 652 (2009); Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir.2005)**

The ALJ considered the relevant factors regarding plaintiff's credibility, and the reasons he gave for his findings were supported by evidence in the record. The fact that he did not weigh the factors the way plaintiff would like does not mean that his credibility determination was legally insufficient. Plaintiff has not demonstrated any error with regard to the credibility findings. As the ALJ's credibility findings were not "patently wrong," they should not be overturned. **Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).** See also, **Castile v. Astrue, 617 F.3d 923, 930 (7th Cir. 2010)**, holding that credibility findings should not be overturned where the ALJ "thoroughly examined the evidence and clearly articulated his findings."

## Conclusion

The ALJ erred in his analysis of Dr. Gesmundo's opinions. Without making any suggestion as to whether plaintiff is, in fact, disabled, or as to what the ALJ's decision should be on reconsideration, this Court concludes that this case must be remanded to the Commissioner for further proceedings. Remand of a social security case can be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is itself a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. See, **Shalala v.**

*Schaefer*, 113 S. Ct. 2625, 2629 (1993); *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, 195 F.3d 975, 978 (7th Cir. 1999).

Here, a sentence four remand is appropriate.

### Recommendation

This Court recommends that the Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

Objections to this Report and Recommendation must be filed on or before **September 27, 2012**.

**Submitted:  September 10, 2012.**

                                        s/ Clifford J. Proud
                                        **CLIFFORD J. PROUD**
                                        **UNITED STATES MAGISTRATE JUDGE**